Filed 10/8/13  P. v. Gonzales CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H032866 |
| Plaintiff and Respondent, | (Santa Clara County Super. Ct. No. 211111) |
| v. | |
| RAMIRO GONZALES, | |
| Defendant and Appellant. | |

**STATEMENT OF THE CASE**

In 2007, the Santa Clara County District Attorney filed a petition to commit defendant Ramiro Gonzales as a sexually violent predator (SVP) under the SVP Act. (Welf. & Inst. Code, § 6600 et seq.)[1]  A jury found that defendant was an SVP, and the trial court ordered defendant to be committed for an indeterminate term.

Defendant appealed from the commitment order.  On appeal, defendant made four arguments:  1) the trial court erred in releasing psychological records to the prosecution and in admitting the testimony of defendant's former therapist; 2) there was insufficient evidence of materially changed circumstances since a 2004 determination that defendant was not an SVP; 3) the trial court erred in refusing to instruct the jury that defendant's

---

[1] Subsequent unspecified statutory references are to the Welfare and Institutions Code.

mental retardation was not a mental disorder for purposes of the SVP Act; and 4) indeterminate commitment under the SVP Act violates various constitutional guarantees.

We held that defendant's first argument warranted reversal. Specifically, we held that the trial court erred in releasing privileged psychotherapeutic records and in admitting testimony concerning privileged information, that the error violated defendant's federal constitutional right of privacy, and that the error was prejudicial under the standard articulated in *Chapman v. California* (1967) 386 U.S. 18. Our Supreme Court reversed. The Supreme Court agreed that the trial court erred in releasing the psychological records and in admitting the testimony of defendant's former therapist, but it concluded that the error was a state law error that was harmless under the standard articulated in *People v. Watson* (1956) 46 Cal.2d 818. The Supreme Court remanded the case to this court and directed us to consider defendant's remaining claims.

We now conclude that there was sufficient evidence of materially changed circumstances, that the trial court did not commit instructional error, and that defendant has failed to show that indeterminate commitment under the SVP Act is unconstitutional. We accordingly will affirm the order committing defendant as an SVP.

**STATEMENT OF THE FACTS**

*Defendant's Background*

Defendant was born in 1955, and he was 53 years old at the time of the SVP trial in 2008. At age seven he contracted spinal meningitis, which resulted in intellectual and developmental disabilities. He thereafter attended special education classes, but he ultimately dropped out of school.

Between 1972 and 1974, defendant was convicted numerous times of petty theft. In 1975, he was convicted of misdemeanor annoying or molesting a five-year-old girl. The probation report stated that while he had an erection, defendant hugged the girl and whispered obscenities to her.

2

In 1977, defendant was convicted of lewd and lascivious conduct with a seven-year-old girl. In that incident, defendant was mowing the lawn at the house where the girl lived. He asked if he could use the phone, but once inside the house he pretended to make a call. The girl's mother became suspicious, called her brother, and waited outside for him, leaving the girl sitting on the couch. When the girl's mother returned, defendant was rubbing the girl's buttocks and crotch area over her clothing. When asked to explain his conduct, defendant said it "looked easy" and he did not know how to "do sex" with women.

Defendant was convicted of vandalism in 1981, and he was convicted of battery in 1989. In 1994, defendant was convicted of molesting a four-year-old girl. In that incident, a woman, who was visiting defendant's sister, put her daughter in a bedroom to sleep, and defendant was caught in the room rubbing the girl's vagina.

Because of his impaired mental and intellectual development, defendant was housed at the San Andreas Regional Center, which provides services to those with developmental disabilities. Defendant received 24-hour care, supervision, and skills training.

Defendant was scheduled to be released on parole in the spring of 2004. At that time, the Santa Clara County District Attorney filed a petition seeking to have defendant committed as an SVP, but the jury found the allegations that he was likely to reoffend not true. Thereafter, defendant was released on parole with conditions that barred use of alcohol, contact with sex offenders, contact with minors, and being within 100 feet of places where children congregate, including parks and schools. He was prohibited from living at his mother's house because it was too close to a school, but he was allowed to visit her. He was required to wear a tracking device and attend an outpatient psychiatric treatment program. Two different parole officers personally read and explained each of the parole conditions to defendant.

3

In July 2004, defendant was arrested for missing an outpatient meeting, and he was released in August 2004. In January 2005, defendant violated parole when he assisted another sex offender who lived in the same motel as defendant. Both offenders were reminded of the no-contact condition. In February 2005, defendant was arrested when parole agents found 20 beer cans in his motel room; he was released in June 2005. He was arrested for drinking in August 2005, and he was released in December 2005.

In April 2006, defendant was fitted with another tracking device, and he agreed to not have contact with anyone under the age of 18 and to report any contacts he had with minors, whether accidental or not. In August 2006, defendant's parole agent learned from the tracking device that defendant had loitered in an area with a playground. The next day, the agent called defendant at his mother's house. When the agent heard children's voices in the background, he and other officers immediately went there. They found two children, defendant's mother, the children's father, and defendant, who was then arrested.[2] Defendant said that he knew he was not supposed to be near the playground, but he said he just stopped to roll some cigarettes and did not look at any of the children. Defendant also knew he was not supposed to be at the house when children were there and admitted that he had been drinking three times a week for a couple of months. Defendant was arrested for violating parole.

*Professional Psychological Testimony*

In January 2006, a parole agent took defendant to the Atkinson Assessment Center for outpatient treatment and counseling as a court-ordered condition of parole. Pat Potter McAndrews was defendant's psychotherapist. She testified that she administered an

---

[2] Defendant's sister testified that she, her husband, and her children had moved to her mother's house after they were evicted. Defendant lived in a motel but visited two or three times per week. He would collect empty cans, buy cigarettes, and drink. She never saw him inappropriately touch her children.

Defendant's mother testified that defendant visited her every week after his release on parole. She knew he was not supposed to drink or be in the house when children were present, but he did so anyway, and she felt she could not stop him.

4

assessment test (the Abel Assessment).  Because of his limited intellectual abilities, she carefully explained and rephrased some of the questions and helped record his answers.  Thereafter, defendant regularly attended his group sessions, and his participation was good.

McAndrews testified that during defendant's initial interview, they discussed his family, medical, social, and criminal history, including his sexual misconduct and his convictions.  He told her that he had been drinking alcohol regularly since he was 14 years old.  She gave him an assessment test, and, in response to one of the questions, defendant told her that between the ages of 14 and 37, he had touched 16 children sexually.  Defendant explained that he was very attracted to children, and when he was drinking he could not really control himself and had an overwhelming desire to touch them.

During the treatment, McAndrews regularly asked defendant if he had been drinking, and he said that he had not done so after his release on parole.  McAndrews was particularly concerned about this because alcohol lowers inhibitions and had played a part in defendant's prior sexual misconduct.  Defendant never told McAndrews that he had been drinking regularly, that his sister and her children had moved into his mother's house, or that he had been visiting his mother's house.  McAndrews said these facts would have been very important to have known because they showed that defendant had the opportunity to commit another offense.  Had she known, she would have been highly concerned because his drinking around children was a "recipe for a sex offense."

After defendant was arrested at his mother's house, two state-appointed psychologists, Jack Vognsen and Thomas MacSpeiden, evaluated him to determine whether he posed a risk of danger.  At the SVP trial, both MacSpeiden and Vognsen testified that defendant met the statutory criteria for an SVP finding:  (1) he had previously been convicted of a sexually violent offense; and (2) he suffered from a

5

diagnosed mental disorder that rendered him dangerous because of a likelihood that he would commit similar offenses. (See § 6600, subd. (a)(1).)

Specifically, both psychologists diagnosed defendant with pedophilia and opined that it impaired his emotional and volitional capacity. MacSpeiden opined that defendant also suffered from alcohol dependency and borderline intellectual functioning. Vognsen opined that defendant suffered from alcohol abuse and mild mental retardation in addition to his pedophilia.

Both psychologists accepted the 2004 jury finding that defendant was not likely to reoffend. However, they both felt that defendant's subsequent parole violations reflected a material change in circumstances after 2004 and demonstrated a decreasing ability to control his behavior. MacSpeiden believed that since 2004 defendant's alcohol misuse had increased, and his presence in places where children were or might have been manifested his diminished control. Vognsen explained that defendant's parole violations since 2004 showed "very impaired ability to control his behavior." Vognsen noted that defendant admitted that alcohol consumption caused him to commit offenses against children, and "yet he began drinking and drank significantly while he was on parole."

Both psychologists administered a standardized risk assessment test designed to evaluate the likelihood of reoffense (Static 99). The test results placed defendant in a very high risk group, and both psychologists testified that in general the test underestimated risk. The psychologists considered a number of other static and dynamic risk factors. Both doctors found that defendant's low intellectual functioning made it difficult for him to learn how to control his impulses. Although defendant had engaged in therapy sessions, the psychologists disagreed concerning whether he was amenable to treatment and could understand how to avoid sexual misconduct. Defendant's pedophilia, combined with his alcohol dependence and low intellectual functioning, made him dangerous.

Based on their evaluations of defendant, both psychologists concluded that he was likely to engage in sexually violent predatory acts as a result of his pedophilia. Vognsen was also concerned that defendant would stay with his mother if released. He noted that when defendant was last arrested, his mother said, "I don't see what the problem is. He just comes here, has a few beers with us and watches the kids." Vognsen considered it dangerous for defendant to rely on his mother for support because "[S]he's so protective and, one might say, enabling of his bad habits."

Two psychologists, Timothy Joseph Derning and Brian Abbott, testified for the defense.

Derning explained that mental retardation is a disability and not an illness. He opined that because of his disability, defendant was dependent on his family and his routine of visiting his mother. Derning therefore believed that it would be very difficult for defendant to alter his habits and develop alternatives to comply with his parole conditions after his sister and her children moved in with defendant's mother.

Derning had previously evaluated defendant in 2004. In this case, he reviewed defendant's records, including police reports, probation and parole reports, the evaluations by MacSpeiden and Vognsen, and the testing by McAndrews. Because of defendant's disabilities and reading difficulties, Derning did not think that defendant could understand the test and did not believe its results were valid. Despite defendant's parole violations after 2004, he did not find that defendant's ability to comply with rules and regulations or control his behavior or sexual impulses had deteriorated. He criticized the contrary conclusions by MacSpeiden and Vognsen for failing to adequately address the impact of defendant's mental retardation. He also believed that mental retardation was a more accurate and appropriate diagnosis than pedophilia. According to Derning, that defendant had on occasion explored sex with little girls could be attributed to the impulsivity associated with his retardation and did not necessarily mean that he was a

7

pedophile or had a sexual preference for children. Derning admitted, however, that defendant's mental retardation was not the cause of defendant's sex crimes.

Abbott also evaluated defendant in 2004 and reviewed defendant's previous and subsequent history and records. He testified that although defendant suffered from mental retardation and alcohol dependence, defendant did not currently suffer from pedophilia, and he faulted the contrary view because it was based on old behavior and failed to consider mental retardation as a possible explanation for defendant's prior sexual behavior. Abbot characterized defendant's inappropriate behavior with girls as isolated incidents of sexual experimentation attributable to poor impulse control and bad judgment, both of which are manifestations of his retardation. Apart from these incidents, Abbott believed that defendant appeared to have adequate control over his sexual impulses and feelings. Since his release on parole, defendant had properly registered as a sex offender, attended counseling and individual therapy, complied with room searches, and worn his tracking device. Thus, except for resuming his lifelong habit of drinking beer, defendant had demonstrated his ability to comply with rules and regulations. Consequently, Abbot did not believe that there had been a material change in defendant's circumstances after his release on parole.

Given defendant's limited verbal skills and retardation, Abbot questioned the validity and reliability of the Abel Assessment, which was not designed to assess those with mental disabilities. He also opined that the Static 99 had inherent design flaws, and he believed the risk of reoffending posed by defendant to be much lower than MacSpeiden or Vognsen had found.

### Defendant's Testimony

Defendant recalled that his parole agent had explained the conditions of parole, and he knew that he was not supposed to drink or be near children. He admitted drinking beer. He recalled molesting the girl in 1994 and explained that he had been drunk. He said he had similarly molested two other girls. He knew that doing so was wrong. He

testified that if he were released on parole, he would register with the police department, see his parole officer, and then see his mother.

## DISCUSSION

### I. *Sufficiency of the Evidence*

Defendant contends that we must reverse the commitment order because there was insufficient evidence of materially changed circumstances since the 2004 determination that defendant was not an SVP. In support of this argument, defendant cites *Turner v. Superior Court* (2003) 105 Cal.App.4th 1046 (*Turner*). As set forth below, defendant's argument is unpersuasive.[3]

To commit defendant as an SVP, "the jury had to find that [defendant] was convicted of a violent sexual offense, he suffered from a mental disorder affecting his volitional or emotional capacity, and the disorder rendered him a danger to others because he was likely to engage in sexually violent criminal behavior." (*People v. Poulsom* (2013) 213 Cal.App.4th 501, 517-518.) Moreover, because the jury at defendant's 2004 SVP trial did not make those findings and he was released on parole, the jury in the instant case also had to find that circumstances had materially changed since the 2004 trial and made defendant likely to reoffend if released from custody.[4] (*Id.* at p. 518; *Turner, supra,* 105 Cal.App.4th at p. 1060.)

"We review sufficiency of the evidence challenges under the SVP Act according to the same standard pertinent to criminal convictions." (*People v. Fulcher* (2006) 136

---

[3] The Supreme Court agreed with our previous conclusion that the trial court erred in permitting McAndrews to testify to the details of defendant's therapy sessions. We therefore will not rely on McAndrews's testimony in evaluating the sufficiency of the evidence.

[4] To this end, the jurors were instructed that in 2004 defendant was found not likely to commit a sexually violent crime, and that they had to accept that finding. They were further advised that they could not find that defendant was likely to reoffend unless the prosecution proved beyond a reasonable doubt that there were materially changed circumstances since 2004 that rendered defendant likely to reoffend.

9

Cal.App.4th 41, 52.)  Under that standard, we "must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Johnson* (1980) 26 Cal.3d 557, 578.)  "In making this determination, we do not reweigh the evidence, resolve conflicts in the evidence, or reevaluate the credibility of witnesses." (*People v. Cortes* (1999) 71 Cal.App.4th 62, 71.)

Here, both MacSpeiden and Vognsen testified that they accepted the 2004 jury determination that defendant was not likely to reoffend.  However, both testified that circumstances had materially changed since then.  MacSpeiden and Vognsen both opined that defendant's post-2004 parole violations, which involved alcohol consumption and presence near children, demonstrated defendant's decreased ability to control his behavior and his increased likelihood for reoffense.  Vognsen expressed a specific concern that defendant admitted that alcohol consumption caused him to molest children, and "yet he began drinking and drank significantly while he was on parole."  MacSpeiden specifically testified that defendant's post-2004 alcohol consumption and contact with children—actions which defendant undertook in violation of his express parole conditions and under threat of incarceration—were "two manifestations of . . . diminished volitional control."  The expert testimony of MacSpeiden and Vognsen thus constituted substantial evidence of materially changed circumstances.  (See Evid.Code, § 411; *People v. Rasmuson* (2006) 145 Cal.App.4th 1487, 1508 [the testimony of one witness may be sufficient to prove any fact].)  Although defendant presented two experts who disagreed with virtually all of MacSpeiden's and Vognsen's conclusions, "[t]he credibility of the experts and their conclusions were matters resolved against defendant by the jury," and "[w]e are not free to reweigh or reinterpret the evidence." (*People v. Mercer* (1999) 70 Cal.App.4th 463, 466-467.)  Accordingly, we conclude that sufficient

10

evidence supported the jury's determination that circumstances had materially changed since 2004 and made defendant likely to reoffend.

Defendant's reliance on *Turner, supra,* 105 Cal.App.4th 1046 is misplaced. *Turner* held that there was insufficient evidence of changed circumstances to support a probable cause determination under the SVP Act. (*Id.* at pp. 1061-1063.) Specifically, *Turner* concluded that expert opinion that the defendant was likely to reoffend—opinion that was based on circumstances present at the time of a prior determination that the defendant was not an SVP—was insufficient to establish changed circumstances. (*Id.* at p. 1062.) *Turner* reasoned: "[W]here an individual has been found not to be an SVP and a petition is properly filed after that finding, the professional cannot rely solely on historical information. The professional must explain what has occurred in the interim to justify the conclusion the individual currently qualifies as an SVP." (*Id.* at p. 1060.)

Defendant's case is distinguishable from *Turner.* Both MacSpeiden and Vognsen specifically testified that their conclusions regarding changed circumstances and likelihood for reoffense were based on the parole violations defendant committed *after* the 2004 SVP trial. Thus, unlike *Turner*, the expert testimony was not based solely on historical facts that were present at the previous SVP trial. *Turner* therefore does not require us to find insufficient evidence of materially changed circumstances.

## II. *Instruction Regarding Mental Retardation*

Defendant contends that mental retardation is not a diagnosed mental disorder within the meaning of the SVP Act, and that the trial court therefore committed reversible error in refusing to give a pinpoint instruction specifying that defendant's mental retardation was not a diagnosed mental disorder. As explained below, defendant's argument is unavailing because the evidence did not support his requested pinpoint instruction.

11

**A.** *Background*

The trial court instructed the jury on four necessary elements for an SVP finding: "The petition alleges that [defendant] is a sexually violent predator. [¶] To prove this allegation, the People must prove beyond a reasonable doubt that: [¶] 1) He has been convicted of committing at least one sexually violent offense against one or more victims; [¶] 2) He has a diagnosed mental disorder; [¶] 3) As a result of that diagnosed mental disorder, he will be a danger to the health and safety of others because it is likely he will engage in sexually violent predatory criminal behavior; AND [¶] 4) It is necessary to keep him in custody in a secure facility to ensure the health and safety of others."

The instructions defined the term "diagnosed mental disorder," as follows: "The term *diagnosed mental disorder* includes congenital or acquired conditions affecting a person's emotional or volitional capacity and predisposing that person to commit criminal sexual acts to an extent that makes him a menace to the health and safety of others."

Defendant requested that the court give the following pinpoint instruction: "You are hereby instructed that you may not use mental retardation as the required diagnosed mental disorder for purposes of satisfying criteria 2 in the definition of sexually violent predator." The court refused to give the instruction, noting that the prosecutor would not argue that defendant's mental retardation constituted the requisite diagnosed mental disorder.

During his closing argument, the prosecutor argued: "The diagnosed mental disorder. The definition in the law that you will be given is that the diagnosed mental disorder has to be . . . the congenital or acquired condition, either born with it or you get it, affects his emotional or volitional capacity, essentially his willpower, his ability to control what he is doing, in such a way predisposes him to commit sexually criminal acts. No one is suggesting that mild mental retardation does that. To do that would be to say that all mildly mentally retarded people are sexually dangerous. . . . [¶] This man has

12

this affliction. It's sad. It's broken. I wish it wasn't true, but it is. And the affliction is pedophilia."

Defense counsel's closing argument emphasized that pedophilia was the diagnosed mental disorder that the People had to prove. Specifically, defense counsel argued, "[T]he question is, does [defendant] qualify for a current diagnosis of pedophilia." Defense counsel thereafter argued that the evidence did not support a diagnosis of pedophilia.

## B. *The Pinpoint Instruction was Not Required*

"[L]egally correct and factually warranted pinpoint instructions designed to elaborate and clarify other instructions should be delivered upon request." (*People v. Hughes* (2002) 27 Cal.4th 825A, 362 (*Hughes*), italics omitted.) A trial court errs when it refuses to give such an instruction. (See *ibid*.)

"[A] claim that a court failed to properly instruct on the applicable principles of law is reviewed de novo." (*People v. Martin* (2000) 78 Cal.App.4th 1107, 1111.) We therefore review defendant's claim de novo.

We conclude that defendant's requested pinpoint instruction was not factually warranted. None of the evidence suggested that defendant's mental retardation was a diagnosed mental disorder that predisposed him to commit sex crimes. Rather, all four psychologists testified that defendant's mental retardation, by itself, was insufficient to constitute the diagnosed mental disorder required by the SVP Act. Vognsen specifically testified that mental retardation is "not . . . a mental condition which causes a person to commit a sexually violent predatory offense." MacSpeiden opined that if defendant suffered only from a low IQ, he would not present a danger of committing sexual offenses. Derning explained that defendant's mental retardation was not the cause of his sex crimes. Abbot noted that the second criteria under the SVP Act is a diagnosed mental disorder, and he emphasized that defendant's mental retardation was not such a diagnosed mental disorder. Thus, the evidence in no way suggested that defendant's

13

mental retardation was a diagnosed mental disorder within the meaning of the SVP Act. (See § 6600, subd. (c) [the diagnosed mental disorder required by the SVP Act is one that "predisposes the person to the commission of criminal sexual acts"].) We accordingly must conclude that the trial court did not err in refusing to give defendant's requested pinpoint instruction. (See *Hughes, supra,* 27 Cal.4th at p. 362 [only pinpoint instructions that are factually warranted need to be given].)

Moreover, even if we were to find error, it is not reasonably probable that the jury would have come to any different conclusion if it had been given defendant's pinpoint instruction. (*People v. Earp* (1999) 20 Cal.4th 826, 887 [finding no prejudice in the trial court's failure to give the defendant's pinpoint instruction where "it is not reasonably probable that had the jury been given defendant's proposed pinpoint instruction, it would have come to any different conclusion in this case"].) During closing argument, the prosecutor emphasized that defendant's mental retardation was not a diagnosed mental disorder within the meaning of the SVP Act. The prosecutor instead argued that defendant's pedophilia was a diagnosed mental disorder for purposes of the SVP Act, and defense counsel's closing argument confirmed that pedophilia was the diagnosed mental disorder that the People had to prove. Thus, because the attorneys' arguments unequivocally conveyed the principle articulated in defendant's pinpoint instruction, it is unlikely that defendant would have achieved a different result had the pinpoint instruction been given. (See *Hughes, supra,* 27 Cal.4th at p. 363 [finding no prejudice in the trial court's failure to give the defendant's pinpoint instruction, in part, because defense counsel's closing argument articulated the substance of the omitted instruction].) Indeed, given the dearth of evidence suggesting that defendant's mental retardation was a diagnosed mental disorder within the meaning of the SVP Act, it is highly improbable that the jury would have reached a different conclusion if the pinpoint instruction had been given. (See generally *People v. Fudge* (1994) 7 Cal.4th 1075, 1112 [considering the strength of the evidence in determining that the defendant was not prejudiced by the trial

14

court's failure to give a pinpoint instruction].)  We therefore must conclude that the trial court's refusal to give the pinpoint instruction is not grounds for reversal.

### III.  *Constitutional Challenges to the SVP Act*

The SVP Act mandates indefinite commitment for an individual found to be an SVP:  "If the court or jury determines that the person is a sexually violent predator, the person shall be committed for an indeterminate term to the custody of the State Department of State Hospitals for appropriate treatment and confinement in a secure facility designated by the Director of State Hospitals."  (§ 6604.)  Defendant contends that indeterminate commitment under the SVP Act violates several constitutional guarantees, namely due process, ex post facto, double jeopardy, equal protection, and the First Amendment right to petition for redress of grievances.  As set forth below, defendant's claims are unpersuasive.

#### A.  *Due Process and Ex Post Facto*

After defendant submitted his opening brief in this court, our Supreme Court issued its opinion in *People v. McKee* (2010) 47 Cal.4th 1172 (*McKee*), which held that indeterminate commitment under the SVP Act does not violate due process or ex post facto principles.  (*Id.* at pp. 1191-1195.)  Defendant's due process and ex post facto arguments are equivalent to those presented by the defendant in *McKee,* and defendant's supplemental brief does not raise any new due process or ex post facto arguments that were not considered in *McKee*.  We are bound by the Supreme Court's determination that indeterminate commitment under the SVP Act does not violate due process or ex post facto principles.  (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d. 450, 455.)  We accordingly conclude that defendant's due process and ex post facto claims are without merit.

#### B.  *Double Jeopardy*

The double jeopardy clause of the Fifth Amendment provides that no person shall "be subject for the same offence to be twice put in jeopardy of life or limb."  (U.S.

Const., 5th Amend.) The clause "protects . . . against the imposition of multiple criminal punishments for the same offense." (*Hudson v. U.S.* (1997) 522 U.S. 93, 99, italics omitted.) Defendant contends that his indeterminate commitment constitutes a second punishment for his crime, that the SVP Act's indeterminate commitment provision is thus punitive in nature, and that we are accordingly required to conclude that the SVP Act's indeterminate commitment provision violates the double jeopardy clause.

*McKee* did not consider whether indeterminate commitment violates the double jeopardy clause. However, in rejecting the ex post facto claim, *McKee* concluded that the indeterminate commitment provision of the SVP Act is not punitive. (*McKee, supra,* 47 Cal.4th at pp. 1194-1195.) *McKee's* conclusion that indeterminate commitment under the SVP Act is not punitive renders defendant's double jeopardy claim meritless. (See *People v. McDonald* (2013) 214 Cal.App.4th 1367, 1383 [citing *McKee's* conclusion that indeterminate commitment is not punitive and holding that indeterminate commitment under the SVP Act does not violate the double jeopardy clause].)

## C. *Equal Protection*

In *McKee*, the defendant argued that indeterminate commitment under the SVP Act violates equal protection because other civilly committed individuals, such as mentally disordered offenders (MDO's) and those found not guilty by reason of insanity (NGI's), are subject to commitment for determinate periods with greater procedural protections. (*McKee, supra,* 47 Cal.4th at pp. 1196, 1200-1202, 1207.) *McKee* held that SVP's are similarly situated to MDO's and NGI's for equal protection purposes, but it concluded that the record was insufficient to determine whether a justification exists for treating SVP's differently from MDO's and NGI's. (*Id.* at pp. 1203-1207.) *McKee* therefore remanded the case to the San Diego Superior Court with directions to hold an evidentiary hearing and determine whether the disparate treatment of SVP's is justified. (*Id.* at pp. 1208-1209.) The superior court conducted an evidentiary hearing and ruled that the People had demonstrated a constitutionally sufficient justification for treating

16

SVP's differently from MDO's and NGI's.  (*People v. McKee* (2012) 207 Cal.App.4th 1325, 1331 (*McKee II*).)  The superior court's order was affirmed by the Fourth Appellate District in *McKee II, supra,* 207 Cal.App.4th 1325, 1350.  The Supreme Court denied review of *McKee II.*

Defendant contends that the Fourth Appellate District improperly evaluated the evidence and erroneously concluded that indeterminate commitment under the SVP Act does not violate equal protection.  He therefore urges us to reevaluate the evidence presented in the San Diego Superior Court, reject the *McKee II* holding, and conclude that indeterminate commitment under the SVP Act does in fact violate equal protection.  As explained below, we decline defendant's invitation to reject *McKee II.*

Ordinarily the opinion of one Court of Appeal is not binding on another Court of Appeal.  (9 Witkin, Cal. Procedure (5th ed. 2008) Appeal, § 498, p. 558.)  "However, there is a tendency for a Court of Appeal to follow decisions from . . . other districts or divisions." (9 Witkin, *supra,* Appeal, § 498, p. 560.)  "Normally, a Court of Appeal will follow prior decisions of . . . other districts or divisions."  (9 Witkin, *supra,* Appeal, § 499, p. 560)  Given the peculiar nature of defendant's claim—he asks us to reevaluate evidence presented in a superior court over which we do not have jurisdiction—we are inclined to adhere to the general tendency and follow the Fourth Appellate District's holding in *McKee II.*  Indeed, we are aware of no procedural principle, and defendant provides none, that permits us to evaluate the evidence presented in the San Diego Superior Court and reach a contrary conclusion to that of the Fourth Appellate District.

The Supreme Court's denial of review in *McKee II* supports our inclination to follow the *McKee II* holding.  We construe the Supreme Court's denial of review as an endorsement of *McKee II.*  The Supreme Court itself has stated that when it denies a petition for review, that ruling is not "without significance."  *(Di Genova v. State Board of Education* (1962) 57 Cal.2d 167, 178.)  We therefore believe that the Supreme Court

17

has impliedly directed us to abide by the Fourth Appellate District's decision in *McKee II*, and we decline defendant's invitation to depart from the holding in *McKee II.*

### D. *First Amendment*

Sections 6605 and 6608 describe the procedures by which an SVP may petition the court for release. Under section 6605, an SVP may petition the court for release only if the Department of State Hospitals (DSH) determines that he no longer meets the criteria for SVP commitment. (§ 6605, subd. (b).) Under section 6608, an SVP may petition the court for release without the concurrence of the DSH. (§ 6608, subd. (a).) Defendant points out several limitations that are placed on section 6608 petitions: the court may deny a frivolous petition without a hearing, the SVP bears the burden of proving suitability for release by a preponderance of the evidence, and section 6608 has no express provision for appointment of a medical expert for the SVP. (§ 6608, subds. (a) & (i).) Defendant asserts that the "combined effect" of sections 6605 and 6608 is to subject SVP's to indeterminate commitment without "meaningful access" to the courts.

The First Amendment guarantees the right "to petition the Government for a redress of grievances." (U.S. Const., 1st Amend.) This constitutional guarantee obligates the government to "assure all prisoners meaningful access to the courts." (*Bounds v. Smith* (1977) 430 U.S. 817, 824.)

Defendant has failed to show that the SVP Act unconstitutionally restricts his right to meaningful access to the courts. Meaningful access to the courts does not include the right to present frivolous claims. (See *Lewis v. Casey* (1996) 518 U.S. 343, 353, fn. 3 ["[d]epriving someone of a frivolous claim . . . deprives him of nothing at all"].) Although section 6608 does not expressly provide for the appointment of a medical expert for an SVP, our Supreme Court has concluded that "such appointment may be reasonably inferred" from the language of the SVP Act. (*McKee, supra,* 47 Cal.4th at p. 1192.) Defendant provides no authority that suggests that placing the burden of proof

18

on the SVP violates the SVP's right to meaningful access to the courts. Defendant therefore has not established that the SVP Act conflicts with the First Amendment.

Moreover, defendant's argument ignores the fact that SVP's are entitled to petition for habeas relief. Section 7250 provides that any person committed to the DSH "is entitled to a writ of habeas corpus, upon a proper application." Defendant points to nothing in the SVP Act that proscribes an SVP's ability to seek habeas relief under section 7250.

Thus, we are compelled to conclude that the SVP Act does not deny SVP's meaningful access to the courts. We accordingly conclude that indeterminate commitment under the SVP Act does not conflict with the First Amendment.

## DISPOSITION

The order of commitment is affirmed.

_____
RUSHING, P.J.

WE CONCUR:

_____
PREMO, J.

_____
ELIA, J.